UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,        Criminal No. 4:13-cr-20809

                                 Hon. Linda V. Parker
                    Plaintiff,   United States District Judge

v.

FRANK HOGG

                    Defendant.

---

## THE UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

---

Frank Hogg pleaded guilty to a drug conspiracy and received a 90 month prison sentence. Hogg was released to supervised release on May 22, 2019. (Sup Rel. Viol. Rep. Pt 2). According to his probation officer, Hogg made little effort to find legitimate employment. Id. Instead, just over two months after his release from custody, on July 30, 2019, Hogg sold an "8 ball" of cocaine base to an informant in Lapeer County, Michigan. (Sup Rel. Viol. Rep., Pt. 1). This caused Lapeer County to bring felony charges against him and for the probation department to move to revoke his supervised release.

Hogg accepted responsibility for the supervised release violation on December 19, 2019 and received 36 months in federal prison. He also pleaded guilty to the state case, and received a sentence of 365 days jail, with credit for 3 days served, on August 10, 2020. (Exhibit A, Judgment of Conviction). If the federal government had chosen to prosecute Hogg's drug offense he would have been a career offender with guidelines of 151 – 188 months in federal prison.

Hogg began serving his current sentence on January 17, 2020. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

First, Hogg's motion is more properly a motion for transfer than a motion for release. Even if this Court grants Hogg's motion for release, Hogg will remain in custody until approximately August 2021 because his state sentence for the conduct underlying his supervised release violation will keep him in custody.

Besides that, Hogg does not satisfy the requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot

independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Even assuming a non-dangerous defendant facing a heightened risk from Covid-19 could demonstrate "extraordinary and compelling reasons" for release, Hogg has not alleged a chronic condition that places him at increased risk for severe complications from Covid-19. (Exhibit B, 2019 and 2020 Medical Records, filed under seal). Hogg was slightly obese in August 2020, but he has not claimed that as a basis for release, alleged that the condition is chronic for him, or exhausted specifically on that ground. He has therefore not demonstrating an "extraordinary" condition warranting his release.

His supervised release violation, criminal conviction, and criminal record also establish that he is dangerous, and he has not demonstrated that his release would reduce his risk of contracting Covid-19, preventing him from showing a "compelling" justification for release. And the § 3553(a) factors do not support release because Hogg has a large portion of his sentence left to serve, he has a long criminal history,

and he committed his current violation extremely soon after his release from prison.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Hogg, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of December 8, 2020, this process has already resulted in the BOP releasing at least 137 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Hogg's motion for compassionate release.

# Background

Between October 2012 and October 2013, Hogg and two others engaged in a conspiracy to distribute over 28 grams of cocaine base in the Flint area. (PSR ¶¶ 11-17). A grand jury indicted Hogg for his role in that conspiracy, and Hogg had high penalties because of his prior record and the mandatory minimum, resulting in a sentence of 90 months in federal prison. (R. 71: Judgment, Pg.Id 326).

On May 22, 2019, the Bureau of Prisons released Hogg to begin supervised release. It did not go well.  His probation officer noted:

> HOGG has demonstrated poor adjustment to community supervision.  HOGG has been disinterested in securing employment and has failed to follow up with those community partners of the probation department that have proven track records with assisting individuals in securing a legitimate income.  HOGG's lack of interest in securing a legitimate income appears, in part, related to his continued preoccupation with criminal activity which he resumed in less than three months of his release from custody.

Instead of obtaining lawful employment, Hogg began selling drugs again. Hogg sold an 8 ball (3.5 grams) of cocaine base to an informant in Lapeer County, resulting in state charges for drug distribution and the revocation of his supervised release.

Hogg accepted responsibility for his supervised release violation and received a 36 month sentence from this Court on December 19, 2019.

Hogg began serving his current prison sentence on January 19, 2020, and later appeared in Lapeer County Circuit Court to receive a 365 day concurrent sentence (with credit for 3 days time served) on August 10, 2020. (Exhibit A, Judgment of Conviction). Hogg is currently incarcerated at Oxford FCI. He is 29 years old, and his projected release date is August 5, 2022. Hogg alleges two medical conditions that he claims support compassionate release---hypertension and asthma. It is not clear that Hogg has hypertension and his asthma does not rise to the level of moderate to severe, and neither condition is one that the CDC has determined definitively raises the risk of severe illness if one contracts Covid-19. Nevertheless, Hogg has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic.

Hogg has properly exhausted his administrative remedies and this Court can rule on his motion on the merits.

## Argument

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

6

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

7

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id*. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 8,012 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 18,547. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id*. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. See 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not

place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

13

## II.   The Court should deny Hogg's motion for compassionate release.

Hogg's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

A defendant must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

14

Third, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   Hogg is not going to be released from custody if the Court grants his motion.

The entire basis for Hogg's motion is that the increased risk that inmates incur from Covid-19 creates an extraordinary and compelling circumstance that warrants his release. A fundamental problem with that argument is that this Court granting Hogg's motion would not cause his release from custody. Because Hogg is serving a 365 day jail term that began in August 2020, Hogg would transfer to Lapeer County Jail if released from the Bureau of Prisons. (Exhibit A, Hogg Judgment of Conviction). Hogg has not proffered that county jails are any less

susceptible to Covid-19 outbreaks or that he will receive better medical care in the Lapeer County jail if he becomes infected with Covid-19. County jails likely have higher turnover amongst inmates and less access to medical care than Bureau of Prisons facilities. Hogg's state sentence would end in roughly July or August 2020, and the chances appear strong that there will be widespread distribution of a Covid-19 vaccine by that time. By the time Hogg is released from custody, it is likely that the current situation that he claims supports his release will be greatly dissipated.

At least one other court has denied compassionate release requests where a defendant has a state sentence to serve. *United States v. Sellers*, No. CR 10-434 (RMB), 2020 WL 1972862, at *2 (D.N.J. Apr. 24, 2020) (denying release where defendant's release would cause transfer to state correctional facility, noting that it "adds a whole new layer of risks that the Court is not prepared to take.")

### B.  Hogg has not shown "extraordinary and compelling reasons" for compassionate release.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), contains two overlapping requirements for scrutinizing an inmate's

initial eligibility for release. First, an inmate must demonstrate that "extraordinary and compelling reasons" warrant a reduction in his sentence. *Id.* Second, release must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id*. That applicable policy statement should be USSG § 1B1.13, which contains various criteria related to a defendant's medical conditions, age-related issues, family circumstances, or other reasons, USSG § 1B1.13 cmt. n.1, and which requires that the defendant "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). That policy statement should be binding here, as the analogous policy statement in USSG § 1B1.10 is for sentence reductions under 18 U.S.C. § 3582(c)(2). *See Dillon v. United States*, 560 U.S. 817, 819 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). Recently, however, a Sixth Circuit panel concluded in *United States v. Jones*, ___ F.3d ___, No. 20-3701, 2020 WL 6817488, *6 (6th Cir. Nov. 20, 2020), that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release.

*Jones's* analysis on that point was incorrect, and the government preserves for further review its argument that USSG § 1B1.13 is binding here and that Hogg has failed to satisfy its requirements, because he was in the community less than three months before committing the same offense that originally landed him in federal prison. Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

But even if the Court were to follow the dicta in *Jones*, Hogg has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a sentence reduction. Even if not mandatory, § 1B1.13 continues to "provide a working definition of 'extraordinary and compelling reasons,'" which can "guide" a district

court's decision "without being conclusive." *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; see also *Jones*, 2020 WL 6817488, at *9 (quoting with approval a prior panel's observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

That statutory language, rather, requires that a defendant satisfy two strict criteria to be initially eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). First, the defendant's reasons must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22,

2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). Second, the defendant's reasons must be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Hogg has not done so.

First, Hogg's reasons for release are not "extraordinary." Everyone in our society faces a risk from Covid-19 right now. Over 250,000 Americans have now died from this terrible disease. So as the Sixth Circuit has stressed, "generalized fears of contracting Covid-19, without more," do not justify compassionate release. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); accord *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020); *United States v. Ramadan*, No. 20-1450, 2020 WL 5758015, at *2 (6th Cir. Sept. 22, 2020). The Bureau of Prisons has also worked diligently to implement precautionary measures reducing the risk from Covid-19 to Hogg and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of

Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Hogg has not alleged a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from Covid-19, his reasons for release are not "extraordinary" and instead present only a "generalized fear[] of contracting Covid-19." *Jackson*, 2020 U.S. App. LEXIS 32269, at *6. The CDC maintains a running list of conditions that are known to place someone at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19). Hogg asserts two conditions that support his contention that he is at higher risk of severe illness from Covid-19.

One of those is asthma. Asthma is not a condition that the CDC has verified presents a higher risk of severe illness if one contracts Covid-19. Instead, the CDC has determined that moderate to severe

asthma may increase the likelihood that one has a severe illness from Covid-19.

In fact, some evidence seems to demonstrate that there is no link between asthma and severity of Covid-19 cases. *See* https://www.rutgers.edu/news/asthma-does-not-seem-increase-severity-covid-19 and https://www.healio.com/news/pulmonology/20200622/asthma-not-associated-with-increased-hospitalization-in-patients-with-covid19 *But see* https://www.hsph.harvard.edu/news/features/non-allergic-asthma-linked-with-increased-risk-of-severe-covid-19

There are different classifications of asthma, from mild to severe. A person with moderate or severe asthma, for example, has abnormal lung function tests, symptoms and uses medication daily. But Hogg's medical records from the Bureau of Prisons show that he took "as needed" medication, and has not been diagnosed with even moderate asthma. Hogg's asthma has never been diagnosed as even moderate, with diagnoses of "mild intermittent" and "mild persistent" (2020 medical records at 49 and 3). There is no indication that the conditions

rises to moderate or severe. The last descriptions of his symptoms likewise do not sound severe, describing that Hogg "denies wheezing, nocturnal symptoms, cough, or activity limitations. Triggers: exercise, seasonal allergies. No recent exacerbations."(2020 Medical Records at 2)

Hogg also claims hypertension, but he has no diagnosis of hypertension, has never been on blood pressure medication, and his last blood pressure reading was 119/69 in late September. (2020 medical records at 2). Hogg has had some elevated blood pressure readings earlier this year, but it appears that he has controlled his blood pressure through life changes discussed within the medical records. (2020 Medical Records at 9). Even if Hogg had hypertension, it is not a condition that the CDC has determined is a definitive risk for a severe illness if one contracts Covid-19.

Finally, while Hogg did not raise the issue, it appears that the BOP recently categorized him as obese for the first time. It appears that Hogg has gained some weight since January 2020, resulting in his first categorization as obese. (2019 Medical Records at 6). This means that this condition is likely not a chronic one given the lack of prior

diagnosis. Moreover, his obesity is at 32.4 BMI, meaning that his path to get below the level constituting obese is not extraordinary. Finally, Hogg himself has not alleged this condition creates a higher risk for severe illness or that the condition is chronic, nor has he cited it as a basis for release.

Because Hogg is only 29 years old, he also does not face the same risk from the disease that the elderly do. The combination of his medical conditions and age, even when considered alongside the Covid-19 pandemic, thus does not rise to the level of an "extraordinary" circumstance.

Second, Hogg's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from

Covid-19; and (4) the risk from Covid-19 that his release would pose to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.*

Hogg's circumstances are even less compelling. The "original grounds" for Hogg's incarceration here was drug dealing less than 90 days after his release for a drug conspiracy. *McGowan*, 2020 WL 3867515, at *2. His conviction for that violation, especially when combined with his lengthy criminal record and overall performance on supervised release, showed that Hogg required a sentence of 36 months in prison. It also showed that Hogg is dangerous, as contemplated under USSG § 1B1.13(2), which should continue to "guide" the Court's analysis here. *Gunn*, 2020 WL 6813995, at *2. And unlike the pretrial defendant in *Bothra*, Hogg was convicted of the violation here—not just

accused of it. So the justice system's "essential" interest in finality weighs far stronger against Hogg's release than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489 U.S. 288, 309 (1989).h

Hogg has also not demonstrated that his release would mitigate his risk of contracting Covid-19. Namely, he will be released from prison to a county jail. Hogg has proffered no evidence that he will be at any less risk in a different jail environment rather than the one he is in currently.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on

26

the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same). So even if the Court were to find that Hogg established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Hogg's long percentage of his remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Here, Hogg has served less than one year out of a three year sentence. This

small percentage of his total sentence served weighs heavily against relief.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with a large percentage of his sentence left to serve, like Hogg, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. Id.

Here, this Court recently sentenced Hogg to 36 months in prison where he re-offended less than 90 days after his release, committing the exact same offense that put him in prison to begin with. Hogg has lengthy criminal record, with three total convictions for drug distribution. The government's original sentencing memorandum, filed under seal, also delineates in great detail the various concerns the government has regarding Hogg's history of being a danger to the

community. Finally, Hogg has discipline in his short time back in BOP
custody, for refusing a work or program assignment and disobeying an
order:

```
-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3399395 - SANCTIONED INCIDENT DATE/TIME: 05-17-2020 0815
UDC HEARING DATE/TIME: 05-19-2020 1214
FACL/UDC/CHAIRPERSON.: MIL/JAIL/KOHLMAN
REPORT REMARKS.......: INMATE DECLINED TO MAKE A STATEMENT
    306  REFUSING WORK/PGM ASSIGNMENT - FREQ: 1
         LP COMM    / 60 DAYS / CS
                    FROM: 05-19-2020  THRU: 07-17-2020
         COMP:    LAW:    60 DAYS LOSS OF COMMISSARY
    307  REFUSING TO OBEY AN ORDER - FREQ: 1
         LP EMAIL   / 60 DAYS / CS
                    FROM: 05-19-2020  THRU: 07-17-2020
         COMP:    LAW:    60 DAYS LOSS OF E-MAIL
-------------------------------------------------------------------------------
```

None of the factors outlined in 18 U.S.C. § 3553 favor Hogg's release, as
Hogg's original offense and violation of supervised release was serious,
his criminal history is serious,  he made little effort to get legitimate
employment upon release, he has re-offended, and then been the subject
of discipline while in custody.

## III.  If the Court were to grant Hogg's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Hogg's motion despite the
government's arguments above, the Court should order that he be
subjected to a 14-day quarantine before the Court releases him to
another inmate population.

29

## Conclusion

Hogg's motion should be denied.


Respectfully Submitted,


MATTHEW SCHNEIDER
United States Attorney

Dated: December 8, 2020        s/CHRISTOPHER W. RAWSTHORNE
Assistant United States Attorney
600 Church Street
210 Federal Building
Flint, Michigan 48502-1280
Phone: (810) 766-5035
Fax:  (810) 766-5427
christopher.rawsthorne@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system which will send notification of such filing.

<u>s/CHRISTOPHER RAWSTHORNE</u>
United States Attorney's Office
600 Church Street
Flint, Michigan 48502-1280